IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
IN ADMIRALTY

COMPASS ROSE SHIPPING, LTD.,

            Plaintiff,           CASE NO.:

vs.

M/V MARIANO LAURO, her engines,
boilers, tackle, etc., *in rem*
and PENINSULA SHIPPING & TRADING
Srl, a foreign corporation,

            Defendants.

_____/

## VERIFIED COMPLAINT
## RULE 9(h)

      COMES NOW Compass Rose Shipping, Ltd.,   (hereinafter Compass Rose), by and through its undersigned attorneys in a cause of action both civil and maritime and alleges upon information and belief:

      1.     This is a case within the admiralty and maritime jurisdiction of this court within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1333.

      2.     Plaintiff brings this action pursuant to Rules B & C of the Supplemental Rules and Local Rules 7.02, 7.03 and 7.05 in order to enforce maritime liens, and seeking a writ of attachment of the vessel and property aboard the vessel owned by defendant Peninsula Shipping & Trading Srl, to obtain security and jurisdiction for *in personam*

claims against the owner of the vessel. The vessel is presently located within the Middle District of Florida.

3.     At all times material hereto, Compass Rose was and now is a foreign limited liability company with its principal place of business in Nassau, Bahamas.

4.     At all times material hereto, defendant Peninsula Shipping & Trading Srl (hereinafter Peninsula), was and is a foreign corporation, with a principal place of business in Sorrento, Italy, and was engaged in business as owner, manager and operator of the M/V MARIANO LAURO, which was operated on the high seas near Florida and in navigable waters of the State of Florida and which now is or will be within the jurisdiction of this Court during the pendency of this action.

5.     At all times hereinafter mentioned, Defendant M/V MARIANO LAURO, was and is a bulk cargo carrier, 371 feet length overall, 69 feet in breadth, with IMO #NO9331804, which vessel is now or will be during the pendency of this action within the jurisdiction of this Court.

6.     On or about November 24, 2009 Peninsula, as owner and Compass Rose, as charterer entered into a time charter agreement for the motor vessel Mariano Lauro (the "Vessel") for a single voyage from Tampa, Florida to Buenaventura, Columbia, (the "Charter") attached hereto as Exhibit A.

7.     The Vessel was delivered pursuant to the terms of the charter agreement for purposes of the voyage contracted for and the vessel loaded a cargo of 5,771 metric tons of diammonium phosphate (DAP) and monoammonium phosphate (MAP) in bulk.

8.   The Vessel departed its loading berth in Tampa, Florida on December 10, 2009 and suffered mechanical failure resulting in the vessel grounding in Tampa Bay.

9.   The Vessel was subsequently refloated and moved to a lay berth in Tampa, where the Vessel remains.

10.   Peninsula has breached the charter agreement by refusing to continue the voyage.

11.   Peninsula has ceased paying wages to the crew of the vessel and has failed to pay port expenses thereby jeopardizing the safety of the cargo aboard the vessel.

12.   Compass Rose has paid charter hire in advance which is unearned by reason of failure to continue the voyage.

13.   In an effort to mitigate damages and avoid damage to the cargo, Compass Rose has been required to pay port expenses at Tampa that are the responsibility of Peninsula and which amount to necessaries provided to the vessel.

14.   Compass Rose has an obligation to deliver the cargo which is aboard the M/V Mariano and will be further damaged in the amount of the costs incurred to discharge the cargo, store the cargo, reload the cargo, shrinkage of cargo due to handling, cost to hire a replacement vessel to transport the cargo, and the cost of port expenses and fees for services necessary for discharge of the cargo from the M/V Mariano Lauro and for the call at Tampa of a replacement vessel for purposes of carrying the cargo to Buenaventura.

COUNT I – MARITIME LIEN

15.    Plaintiff hereby incorporates paragraphs one through fourteen as if fully restated and further alleges:

16.    Peninsula has breached the charter agreement by failing or refusing to continue the voyage and by failing to care for the vessel and cargo at Tampa by failing to pay expenses that are the obligation of the vessel owner.

17.    As a result of the breach of the charter Compass Rose has a maritime lien on the vessel for all monies paid in advance and not earned and for overpayment of hire based on Peninsula's failure to complete the voyage.

18.    Compass Rose also has a lien against the vessel for necessaries provided at Tampa by reason of the owner's failure to pay agency fees, guard fees, dockage and other vessel expenses at Tampa which are necessary to preserve and protect the integrity of the cargo aboard the vessel.

19.    Compass Rose holds a valid and existing maritime lien on the Defendant M/V MARIANO LAURO, as a result of payment of unearned charter hire and providing necessaries to the vessel, as a result of which the M/V MARIANO LAURO and Peninsula, owe the Plaintiff approximately $750,000.00 plus interest and all other costs of this action, including Marshal's fees and expenses, fees and costs of the substitute custodian, fees and costs of keeping, preserving and protecting the vessel and cargo, and costs in this and any other necessary legal proceeding.

20.    Plaintiff was the supplier of necessaries to the vessel, on the authority of the master or owner, in the form of dockage, supplies, and services and has a maritime

lien pursuant to the Maritime Lien Act, 46 U.S.C. §§ 31301 – 31343 and/or has a lien pursuant to the terms of the charter party.

    21.    Plaintiff has duly performed all duties and obligations on its part to be performed.

    22.    By reason of the premises, Plaintiff has sustained damages as nearly as same can now be estimated, no part of which has been paid, although duly demanded, in the amount of $750,000.00.

COUNT II – BREACH OF CONTRACT

    23.    Plaintiff hereby incorporates paragraphs one through fourteen as if restated in full and further alleges:

    24.    This is an action for security in aid of arbitration pursuant to 9 U.S.C. § 1, et. seq., 9 U.S.C. § 201, et. seq. and other applicable laws of the United States and/or the State of Florida.  Plaintiff is entitled to arbitrate this matter in London pursuant to the terms of the charter party attached hereto as Exhibit A, which makes English law applicable to disputes between the parties; alternatively, should it be found that plaintiff is not entitled to arbitrate this claim under the charter party, this claim should be resolved before this court

    25.    Defendant Peninsula cannot be found within this District within the meaning of Supplemental Rule B and Local Rule 7.02(a).  However, defendant Peninsula has property, good, chattels, or credits and effects that are now within the District to-wit: the M/V Mariano Lauro.

26.     Plaintiff has duly performed all duties and obligations on its part to be performed pursuant to the terms of the charter party.

27.     As a result of breach of the charter party, plaintiff has been damaged in the amount of at least $930,000.00, including interest and costs in this action and interest and the estimated cost of arbitration.

WHEREFORE, Plaintiff prays:

A.     That process in due form of law according to the rules and practices of this Honorable Court in causes of admiralty and maritime jurisdiction may issue against the M/V MARIANO LAURO her engines, tackle, furniture, apparel, appurtenances, etc., and that all persons claiming any title or right to said vessel may be cited to appear and answer under oath the allegations of this Verified Complaint;

B.     That pursuant to a Warrant of Arrest and pursuant to a Writ of Attachment and Garnishment, the United States Marshal of this District arrest and attach said vessel and retain said vessel under arrest and attachment pending further order of this Court;

C.     That the maritime lien of the Plaintiff be declared valid and that it may have a decree against the M/V MARIANO LAURO, her engines, tackle, furniture, apparel, appurtenances, etc., on board and on shore, for the full amount of the aforesaid claims, interest and costs;

D.     That a decree may be entered in favor of Plaintiff against Defendants, both *in rem* and *in personam* for the amount of Plaintiff's damages together with interest, costs and attorney's fees;

E.      That M/V MARIANO LAURO be attached pursuant to Supplemental Rule B and Local Rule 7.02 and that Process of Attachment and Garnishment be issued in the amount of $930,000.00, plus interest costs and attorney's fees.

F.      That the M/V MARIANO LAURO, her engines, tackle, furniture, apparel, appurtenances, etc., on board and on shore, be condemned and sold, free and clear of all liens and encumbrances to satisfy the judgment entered on Plaintiff's Verified Complaint and that this Honorable Court award Plaintiff out of the proceeds of said sale, the full amount of its claims as aforesaid with preference and priority over all other persons, firms, and corporations whomsoever and whatsoever;

G.      Alternatively that after due proceedings be had, that any and all goods and chattels of the defendant be retained within this jurisdiction pending the outcome of this litigation and/or arbitration proceedings or pending the issuance of proper and solvent security by the defendant.

H.      That this Honorable Court decree the manner in which notice of the commencement of this action be given by Plaintiff to the owner, master or caretaker of the M/V MARIANO LAURO; and

I.      That plaintiff have such other and further relief as law and justice and equity may allow.

Signature follows on next page

_____
Timothy P. Shusta (Trial Counsel)
FBN: 442305
shustat@phelps.com
Phelps Dunbar LLP
100 S. Ashley Drive, Ste. 1900
Tampa, Florida  33602-5315
(813) 472-7550
(813) 472-7570 (Facsimile)
Attorneys for Compass Rose Shipping, Ltd.

## VERIFICATION

**STATE OF FLORIDA**

**COUNTY OF HILLSBOROUGH**

Timothy P. Shusta, being duly sworn deposes and says:

I am an attorney in the Phelps Dunbar, LLP law firm, counsel for Compass Rose Shipping, Ltd. ("Compass Rose"), plaintiff in this action. I have read the foregoing Complaint and know the contents thereof, which are true and correct to the best of my knowledge and belief. The sources of his information and the grounds for his knowledge are review of various documents relating to this matter as well as communication with representatives of Compass Rose regarding this matter. I am authorized by Compass Rose to make this verification and the reason for my making it, rather than an officer or director of Compass Rose is that there are no officers or directors of Compass Rose within the jurisdiction of this Honorable Court.

FURTHER AFFIANT SAYETH NOT.

_____
Timothy P. Shusta

Affiant is personally known to me and did take an oath.
**SWORN TO AND SUBSCRIBED** before me on February 3rd, 2010.

_____
NOTARY PUBLIC, STATE OF FLORIDA
AT LARGE

MY COMMISSION EXPIRES:

_____

NOTARY PUBLIC-STATE OF FLORIDA
Mary H. Lewis
Commission #DD663308
Expires: JUNE 03, 2011
BONDED THRU ATLANTIC BONDING CO., INC.

| 1. Shipbroker | RECOMMENDED **THE BALTIC AND INTERNATIONAL MARITIME COUNCIL UNIFORM GENERAL CHARTER (AS REVISED 1922, 1976 and 1994)** (To be used for trades for which no specially approved form is in force) **CODE NAME: "GENCON"** Part I | |
|---|---|---|
| | 2. Place and Date **Houston, Texas May 29, 2009** | |
| 3. Owners/Place of business (Cl. 1) **Compass Rose Shipping Ltd., Nassau, Bahamas** | 4. Charterers/Place of business (Cl. 1) **Monomeros International Ltd., British Virgin Islands** | |
| 5. Vessel's name (Cl. 1) **To be nominated** | 6. GT/NT (Cl. 1) **To be advised** | |
| 7. DWT all told on summer load line in metric tons (abt.) (Cl. 1) **To be advised** | 8. Present position (Cl. 1) **To be advised** | |
| 9. Expected ready to load (abt.) (Cl. 1) **To be advised** | | |
| 10. Loading port or place (Cl. 1) **See Clause # 20** | 11. Discharging port or place (Cl. 1) **See Clause # 21** | |
| 12. Cargo (also state quantity and margin in Owners' option, if agreed; if full and complete cargo not agreed state "part cargo") (Cl. 1) **See Clause # 22** | | |
| 13. Freight rate (also state whether freight prepaid or payable on delivery) (Cl. 4) **See Clause # 23** | 14. Freight payment (state currency and method of payment; also beneficiary and bank account) (Cl. 4) **See Clause # 24** | |
| 15. State if vessel's cargo handling gear shall not be used (Cl. 5) **Gear to be used** | 16. Laytime (if separate laytime for load. and disch. is agreed, fill in a) and b). If total laytime for load. and disch., fill in c) only) (Cl. 6) | |
| 17. Shippers/Place of business (Cl. 6) **To be advised** | (a) Laytime for loading **See Clause # 25** | |
| 18. Agents (loading) (Cl. 6) **To be nominated by Owners except for Puerto Jose where Owners to chose from 3 aggents nominated by shippers.** | (b) Laytime for discharging **See Clause # 25** | |
| 19. Agents (discharging) (Cl. 6) **Bulk Maritime Agencies ltda.** | (c) Total laytime for loading and discharging | |
| 20. Demurrage rate and manner payable (loading and discharging) (Cl. 7) **See Clausse # 26** | 21. Cancelling date (Cl. 9) | |
| | 22. General Average to be adjusted at (Cl. 12) **New Yoke or London in Owners' option** | |
| 23. Freight Tax (state if for the Owners' account (Cl. 13 (c)) **As per clause 13** | 24. Brokerage commission and to whom payable (Cl. 15) **None** | |
| 25. Law and Arbitration (state 19 (a), 19 (b) or 19 (c) of Cl. 19; if 19 (c) agreed also state Place of Arbitration) (if not filled in 19 (a) shall apply) (Cl. 19) **US Law, in New York (see clause 19)** (a) State maximum amount for small claims/shortened arbitration (Cl. 19) **US$ 75,000 (seventy five thousand)** | 26. Additional clauses covering special provisions, if agreed **Clause # 18 through Clause # 44, both inclusive, to form part of this Charter party** | |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter Party which shall include Part I as well as Part II. In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.

| Signature (Owners) **For and on behalf of COMPASS ROSE SHIPPING LTD.** *Clipper Americas, Inc. as agents only* | Signature (Charterers) *[signature]* **GERENCIA JURIDICA** *Sergio Arguello A.* |
|---|---|

Printed by BIMCO's idea

Copyright, published by The Baltic and International Maritime Council (BIMCO), Copenhagen

This document is a computer generated GENCON 1994 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

EXHIBIT A

**PART II**
**"Gencon" Charter (As Revised 1922, 1976 and 1994)**

1. It is agreed between the party mentioned in Box 3 as the Owners of the Vessel named in Box 5, of the GT/NT indicated in Box 6 and carrying about the number of metric tons of deadweight capacity all told on summer loadline stated in Box 7, now in position as stated in Box 8 and expected ready to load under this Charter Party about the date indicated in Box 9, and the party mentioned as the Charterers in Box 4 that:
The said Vessel shall, as soon as her prior commitments have been completed, proceed to the loading port(s) or place(s) stated in Box 10 or so near thereto as she may safely get and lie always afloat, and there load a full and complete cargo (if shipment of deck cargo agreed same to be at the Charterers' risk and responsibility) as stated in Box 12, which the Charterers bind themselves to ship, and being so loaded the Vessel shall proceed to the discharging port(s) or place(s) stated in Box 11 as ordered on signing Bills of Lading, or so near thereto as she may safely get and lie always afloat, and there deliver the cargo.

2. **Owners' Responsibility Clause**
The Owners are to be responsible for loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by personal want of due diligence on the part of the Owners or their Manager to make the Vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied, or by the personal act or default of the Owners or their Manager.
And the Owners are not responsible for loss, damage or delay arising from any other cause whatsoever, even from the neglect or default of the Master or crew or some other person employed by the Owners on board or ashore for whose acts they would, but for this Clause, be responsible, or from unseaworthiness of the Vessel on loading or commencement of the voyage or at any time whatsoever.

3. **Deviation Clause**
The Vessel has liberty to call at any port or ports in any order, for any purpose, to sail without pilots, to tow and/or assist Vessels in all situations, and also to deviate for the purpose of saving life and/or property.

4. ~~Payment of Freight~~
~~(a) The freight at the rate stated in Box 13 shall be paid in cash calculated on the intaken quantity of cargo.~~
~~(b) Prepaid. If according to Box 13 freight is to be paid on shipment, it shall be deemed earned and non-returnable, Vessel and/or cargo lost or not lost. Neither the Owners nor their agents shall be required to sign or endorse bills of lading showing freight prepaid unless the freight due to the Owners has actually been paid.~~
~~(c) On delivery. If according to Box 13 freight, or part thereof, is payable at destination it shall not be deemed earned until the cargo is thus delivered. Notwithstanding the provisions under (a), if freight or part thereof is payable on delivery of the cargo the Charterers shall have the option of paying the freight on delivered weight/quantity provided such option is declared before breaking bulk and the weight/quantity can be ascertained by official weighing machine, joint draft survey or tally.~~
~~Cash for Vessel's ordinary disbursements at the port of loading to be advanced by the Charterers, if required, at highest current rate of exchange, subject to two (2) per cent to cover insurance and other expenses.~~

5. **Loading/Discharging**
(a) Costs/Risks
The cargo shall be brought into the holds, loaded, stowed and/or trimmed, tallied, lashed and/or secured and taken from the holds and discharged by the Charterers, free of any risk, liability and expense whatsoever to the Owners. The Charterers shall provide and lay all dunnage material as required for the proper stowage and protection of the cargo on board, the Owners allowing the use of all dunnage available on board. The Charterers shall be responsible for and pay the cost of removing their dunnage after discharge of the cargo under this Charter Party and time to count until dunnage has been removed.
(b) Cargo Handling Gear
Unless the Vessel is gearless or unless it has been agreed between the parties that the Vessel's gear shall not be used and stated as such in Box 15, the Owners shall throughout the duration of loading/discharging give free use of the Vessel's cargo handling gear and of sufficient motive power to operate all such cargo handling gear. All such equipment to be in good working order. Unless caused by negligence of the stevedores, time lost by breakdown of the Vessel's cargo handling gear or motive power - pro rata the total number of cranes/winches required at that time for the loading/discharging of cargo under this Charter Party - shall not count as laytime or time on demurrage.
On request the Owners shall provide free of charge cranemen/winchmen from the crew to operate the Vessel's cargo handling gear, unless local regulations prohibit this, in which latter event shore labourers shall be for the account of the Charterers. Cranemen/winchmen shall be under the Charterers' risk and responsibility and as stevedores to be deemed as their servants but shall always work under the supervision of the Master.
(c) Stevedore Damage

| 1 | The Charterers shall be responsible for damage (beyond ordinary wear and | 77 |

The Charterers shall be responsible for damage (beyond ordinary wear and tear) to any part of the Vessel caused by Stevedores. Such damage shall be notified as soon as reasonably possible by the Master to the Charterers or their agents and to their Stevedores, failing which the Charterers shall not be held responsible. The Master shall endeavour to obtain the Stevedores' written acknowledgement of liability.
The Charterers are obliged to repair any stevedore damage prior to completion of the voyage, but must repair stevedore damage affecting the Vessel's seaworthiness or class before the Vessel sails from the port where such damage was caused or found. All additional expenses incurred shall be for the account of the Charterers and any time lost shall be for the account of and shall be paid to the Owners by the Charterers at the demurrage rate.

6. **Laytime**
~~* (a) Separate laytime for loading and discharging~~
~~The cargo shall be loaded within the number of running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.~~
~~The cargo shall be discharged within the number of running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.~~
~~* (b) Total laytime for loading and discharging~~
~~The cargo shall be loaded and discharged within the number of total running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.~~
(c) Commencement of laytime (loading and discharging)
Laytime for loading and discharging shall commence at 13.00 hours, if notice of readiness is given up to and including 12.00 hours, and at 06.00 07.00 hours next working day if notice given during office hours after 12.00 hours. Notice of readiness at loading port to be given to the Shippers named in Box 17 or if not named, to the Charterers or their agents named in Box 18. Notice of readiness at the discharging port to be given to the Receivers or, if not known, to the Charterers or their agents named in Box 19.
If the loading/discharging berth is not available on the Vessel's arrival at or off the port of loading/discharging, the Vessel shall be entitled to give notice of readiness within ordinary office hours on arrival there, whether in free pratique or not, whether customs cleared or not. Laytime or time on demurrage shall then count as if she were in berth and in all respects ready for loading/discharging provided that the Master warrants that she is in fact ready in all respects. Time used in moving from the place of waiting to the loading/discharging berth shall not count as laytime.
If, after inspection, the Vessel is found not to be ready in all respects to load/discharge time lost after the discovery thereof until the Vessel is again ready to load/discharge shall not count as laytime.
Time used before commencement of laytime shall count.
* Indicate alternative (a) or (b) as agreed, in Box 16.

7. **Demurrage**
Demurrage at the loading and discharging port is payable by the Charterers at the rate stated in Box 20 in the manner stated in Box 20 per day or pro rata for any part of a day. Demurrage shall fall due day by day and shall be payable upon receipt of the Owners' invoice.
~~In the event the demurrage is not paid in accordance with the above, the Owners shall give the Charterers 96 running hours written notice to rectify the failure. If the demurrage is not paid at the expiration of this time limit and if the vessel is in or at the loading port, the Owners are entitled at any time to terminate the Charter Party and claim damages for any losses caused thereby.~~

8. **Lien Clause**
The Owners shall have a lien on the cargo and on all sub-freights payable in respect of the cargo, for freight, deadfreight, demurrage, claims for damages and for all other amounts due under this Charter Party including costs of recovering same.

9. **Cancelling Clause**
(a) Should the Vessel not be ready to load (whether in berth or not) on the cancelling date indicated in Box 21, the Charterers shall have the option of cancelling this Charter Party.
(b) Should the Owners anticipate that, despite the exercise of due diligence, the Vessel will not be ready to load by the cancelling date, they shall notify the Charterers thereof without delay stating the expected date of the Vessel's readiness to load and asking whether the Charterers will exercise their option of cancelling the Charter Party, or agree to a new cancelling date.
Such option must be declared by the Charterers within 48 running hours after the receipt of the Owners' notice. If the Charterers do not exercise their option of cancelling, then this Charter Party shall be deemed to be amended such that the seventh day after the new readiness date stated in the Owners' notification to the Charterers shall be the new cancelling date.
The provisions of sub-clause (b) of this Clause shall operate only once, and in

(line numbers right margin: 77-151)

This document is a computer generated GENCON 1994 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

GERENCIA JURIDICA
Scripto y que lle M.



**PART II**
**"Gencon" Charter (As Revised 1922, 1976 and 1994)**

case of the Vessel's farther delay, the Charterers shall have the option of 152
cancelling the Charter Party as per sub-clause (a) of this Clause. 153

**10. Bills of Lading** 154

Bills of Lading shall be presented and signed by the Master as per the 155
"Congenbill" Bill of Lading form, Edition 1994, without prejudice to this Charter 156
Party, or by the Owners' agents provided written authority has been given by 157
Owners to the agents, a copy of which is to be furnished to the Charterers. The 158
Charterers shall indemnify the Owners against all consequences or liabilities 159
that may arise from the signing of bills of lading as presented to the extent that 160
the terms or contents of such bills of lading impose or result in the imposition of 161
more onerous liabilities upon the Owners than those assumed by the Owners 162
under this Charter Party. 163

**11. Both-to-Blame Collision Clause** 164

If the Vessel comes into collision with another vessel as a result of the 165
negligence of the other vessel and any act, neglect or default of the Master, 166
Mariner, Pilot or the servants of the Owners in the navigation or in the 167
management of the Vessel, the owners of the cargo carried hereunder will 168
indemnify the Owners against all loss or liability to the other or non-carrying 169
vessel or her owners in so far as such loss or liability represents loss of, or 170
damage to, or any claim whatsoever of the owners of said cargo, paid or 171
payable by the other or non-carrying vessel or her owners to the owners of said 172
cargo and set-off, recouped or recovered by the other or non-carrying vessel 173
or her owners as part of their claim against the carrying Vessel or the Owners. 174
The foregoing provisions shall also apply where the owners, operators or those 175
in charge of any vessel or vessels or objects other than, or in addition to, the 176
colliding vessels or objects are at fault in respect of a collision or contact. 177

**12. General Average and New Jason Clause** 178

General Average shall be adjusted in London unless otherwise agreed in Box 179
22 according to York-Antwerp Rules 1994 and any subsequent modification 180
thereof. Proprietors of cargo to pay the cargo's share in the general expenses 181
even if same have been necessitated through neglect or default of the Owners' 182
servants (see Clause 2). 183
If General Average is to be adjusted in accordance with the law and practice of 184
the United States of America, the following Clause shall apply: "In the event of 185
accident, danger, damage or disaster before or after the commencement of the 186
voyage, resulting from any cause whatsoever, whether due to negligence or 187
not, for which, or for the consequence of which, the Owners are not 188
responsible, by statute, contract or otherwise, the cargo shippers, consignees 189
or the owners of the cargo shall contribute with the Owners in General Average 190
to the payment of any sacrifices, losses or expenses of a General Average 191
nature that may be made or incurred and shall pay salvage and special charges 192
incurred in respect of the cargo. If a salving vessel is owned or operated by the 193
Owners, salvage shall be paid for as fully as if the said salving vessel or vessels 194
belonged to strangers. Such deposit as the Owners, or their agents, may deem 195
sufficient to cover the estimated contribution of the goods and any salvage and 196
special charges thereon shall, if required, be made by the cargo, shippers, 197
consignees or owners of the goods to the Owners before delivery.". 198

**13. Taxes and Dues Clause** 199

(a) *On Vessel* -The Owners shall pay all dues, charges and taxes customarily 200
levied on the Vessel, howsoever the amount thereof may be assessed. 201
(b) *On cargo* -The Charterers shall pay all dues, charges, duties and taxes 202
customarily levied on the cargo, howsoever the amount thereof may be 203
assessed. 204
(c) *On freight* -Unless otherwise agreed in Box 23, taxes levied on the freight 205
shall be for the Charterers' account. 206

**14. Agency** 207

In every case the Owners shall appoint their own Agent both at the port of 208
loading and the port of discharge. 209

**15. Brokerage** 210

A brokerage commission at the rate stated in Box 24 on the freight, dead freight 211
and demurrage earned is due to the party mentioned in Box 24. 212
In case of non-execution 1/3 of the brokerage on the estimated amount of 213
freight to be paid by the party responsible for such non-execution to the 214
Brokers as indemnity for the latter's expenses and work. In case of more 215
voyages the amount of indemnity to be agreed. 216

**16. General Strike Clause** 217

(a) If there is a strike or lock-out affecting or preventing the actual loading of the 218
cargo, or any part of it, when the Vessel is ready to proceed from her last port or 219
at any time during the voyage to the port or ports of loading or after her arrival 220
there, the Master or the Owners may ask the Charterers to declare, that they 221
agree to reckon the laydays as if there were no strike or lock-out. Unless the 222
Charterers have given such declaration in writing (by telegram, if necessary) 223
within 24 hours, the Owners shall have the option of cancelling the Charter 224

Party. If part cargo has already been loaded, the Owners must proceed with 225
same, (freight payable on loaded quantity only) having liberty to complete with 226
other cargo on the way for their own account. 227
(b) If there is a strike or lock-out affecting or preventing the actual discharging 228
of the cargo on or after the Vessel's arrival at or off port of discharge and same 229
has not been settled within 48 hours, the Charterers shall have the option of 230
keeping the Vessel waiting until such strike or lock-out is at an end against 231
paying half demurrage after expiration of the time provided for discharging 232
until the strike or lock-out terminates and thereafter full demurrage shall be 233
payable until the completion of discharging, or of ordering the Vessel to a safe 234
port where she can safely discharge without risk of being detained by strike or 235
lock-out. Such orders to be given within 48 hours after the Master or the 236
Owners have given notice to the Charterers of the strike or lock-out affecting 237
the discharge. On delivery of the cargo at such port, all conditions of this 238
Charter Party and of the Bill of Lading shall apply and the Vessel shall receive 239
the same freight as if she had discharged at the original port of destination, 240
except that if the distance to the substituted port exceeds 100 nautical miles, 241
the freight on the cargo delivered at the substituted port to be increased in 242
proportion. 243
(c) Except for the obligations described above, neither the Charterers nor the 244
Owners shall be responsible for the consequences of any strikes or lock-outs 245
preventing or affecting the actual loading or discharging of the cargo. 246

**17. War Risks ("Voywar 1993")** 247

(1) For the purpose of this Clause, the words: 248
(a) The "Owners" shall include the shipowners, bareboat charterers, 249
disponent owners, managers or other operators who are charged with the 250
management of the Vessel, and the Master; and 251
(b) "War Risks" shall include any war (whether actual or threatened), act of 252
war, civil war, hostilities, revolution, rebellion, civil commotion, warlike 253
operations, the laying of mines (whether actual or reported), acts of piracy, 254
acts of terrorists, acts of hostility or malicious damage, blockades 255
(whether imposed against all Vessels or imposed selectively against 256
Vessels of certain flags or ownership, or against certain cargoes or crews 257
or otherwise howsoever), by any person, body, terrorist or political group, 258
or the Government of any state whatsoever, which, in the reasonable 259
judgement of the Master and/or the Owners, may be dangerous or are 260
likely to be or to become dangerous to the Vessel, her cargo, crew or other 261
persons on board the Vessel. 262
(2) If at any time before the Vessel commences loading, it appears that, in the 263
reasonable judgement of the Master and/or the Owners, performance of 264
the Contract of Carriage, or any part of it, may expose, or is likely to expose, 265
the Vessel, her cargo, crew or other persons on board the Vessel to War 266
Risks, the Owners may give notice to the Charterers cancelling this 267
Contract of Carriage, or may refuse to perform such part of it as may 268
expose, or may be likely to expose, the Vessel, her cargo, crew or other 269
persons on board the Vessel to War Risks: provided always that if this 270
Contract of Carriage provides that loading or discharging is to take place 271
within a range of ports, and at the port or ports nominated by the Charterers 272
the Vessel, her cargo, crew, or other persons onboard the Vessel may be 273
exposed, or may be likely to be exposed, to War Risks, the Owners shall 274
first require the Charterers to nominate any other safe port which lies 275
within the range for loading or discharging, and may only cancel this 276
Contract of Carriage if the Charterers shall not have nominated such safe 277
port or ports within 48 hours of receipt of notice of such requirement. 278
(3) The Owners shall not be required to continue to load cargo for any voyage, 279
or to sign Bills of Lading for any port or place, or to proceed or continue on 280
any voyage, or on any part thereof, or to proceed through any canal or 281
waterway, or to proceed to or remain at any port or place whatsoever, 282
where it appears, either after the loading of the cargo commences, or at 283
any stage of the voyage thereafter before the discharge of the cargo is 284
completed, that, in the reasonable judgement of the Master and/or the 285
Owners, the Vessel, her cargo (or any part thereof), crew or other persons 286
on board the Vessel (or any one or more of them) may be, or are likely to be, 287
exposed to War Risks. If should so appear, the Owners may by notice 288
request the Charterers to nominate a safe port for the discharge of the 289
cargo or any part thereof, and if within 48 hours of the receipt of such 290
notice, the Charterers shall not have nominated such a port, the Owners 291
may discharge the cargo at any safe port of their choice (including the port 292
of loading) in complete fulfilment of the Contract of Carriage. The Owners 293
shall be entitled to recover from the Charterers the extra expenses of such 294
discharge and, if the discharge takes place at any port other than the 295
loading port, to receive the full freight as though the cargo had been 296
carried to the discharging port and if the extra distance exceeds 100 miles, 297
to additional freight which shall be the same percentage of the freight 298
contracted for as the percentage which the extra distance represents to 299
the distance of the normal and customary route, the Owners having a lien 300
on the cargo for such expenses and freight. 301
(4) If at any stage of the voyage after the loading of the cargo commences, it 302

This document is a computer generated GENCON 1994 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.


GERENCIA JURIDICA
Sergio Arguello A.



## PART II
## "Gencon" Charter (As Revised 1922, 1976 and 1994)

appears that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo, crew or other persons on board the Vessel may be, or are likely to be, exposed to War Risks on any part of the route (including any canal or waterway) which is normally and customarily used in a voyage of the nature contracted for, and there is another longer route to the discharging port, the Owners shall give notice to the Charterers that this route will be taken. In this event the Owners shall be entitled, if the total extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route. 303–313

(5) The Vessel shall have liberty:-

(a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery or in any way whatsoever which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government which so requires, or any body or group acting with the power to compel compliance with their orders or directions; 314–321

(b) to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance; 322–324

(c) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement; 325–330

(d) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier; 331–332

(e) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions; 333–335

(f) where cargo has not been loaded or has been discharged by the Owners under any provisions of this Clause, to load other cargo for the Owners' own benefit and carry it to any other port or ports whatsoever, whether backwards or forwards or in a contrary direction to the ordinary or customary route. 336–340

(6) If in compliance with any of the provisions of sub-clauses (2) to (5) of this Clause anything is done or not done, such shall not be deemed to be a deviation, but shall be considered as due fulfilment of the Contract of Carriage. 341–344

## 18.  General Ice Clause

*Port of loading*

(a) In the event of the loading port being inaccessible by reason of ice when the Vessel is ready to proceed from her last port or at any time during the voyage or on the Vessel's arrival or in case frost sets in after the Vessel's arrival, the Master for fear of being frozen in is at liberty to leave without cargo, and this Charter Party shall be null and void. 345–350

(b) If during loading the Master, for fear of the Vessel being frozen in, deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to any other port or ports with option of completing cargo for the Owners' benefit for any port or ports including port of discharge. Any part cargo thus loaded under this Charter Party to be forwarded to destination at the Vessel's expense but against payment of freight, provided that no extra expenses be thereby caused to the Charterers, freight being paid on quantity delivered (in proportion if lumpsum), all other conditions as per this Charter 351–359

Party. 360

(c) In case of more than one loading port, and if one or more of the ports are closed by ice, the Master or the Owners to be at liberty either to load the part cargo at the open port and fill up elsewhere for their own account as under section (b) or to declare the Charter Party null and void unless the Charterers agree to load full cargo at the open port. 361–365

*Port of discharge*

(a) Should ice prevent the Vessel from reaching port of discharge the Charterers shall have the option of keeping the Vessel waiting until the re-opening of navigation and paying demurrage or of ordering the Vessel to a safe and immediately accessible port where she can safely discharge without risk of detention by ice. Such orders to be given within 48 hours after the Master or the Owners have given notice to the Charterers of the impossibility of reaching port of destination. 366–373

(b) If during discharging the Master for fear of the Vessel being frozen in deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to the nearest accessible port where she can safely discharge. 373–376

(c) On delivery of the cargo at such port, all conditions of the Bill of Lading shall apply and the Vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance of the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion. 377–381

## 19.  Law and Arbitration

* (a) This Charter Party shall be governed by and construed in accordance with ~~English law and any dispute arising out of this Charter Party shall be referred to arbitration in London in accordance with the Arbitration Acts 1950 and 1979 or any statutory modification or re-enactment thereof for the time being in force. Unless the parties agree upon a sole arbitrator, one arbitrator shall be appointed by each party and the arbitrators so appointed shall appoint a third arbitrator, the decision of the three-man tribunal thus constituted or any two of them, shall be final. On the receipt by one party of the nomination in writing of the other party's arbitrator, that party shall appoint their arbitrator within fourteen days, failing which the decision of the single arbitrator appointed shall be final.~~ 382–392

~~For disputes where the total amount claimed by either party does not exceed the amount stated in Box 25** the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime Arbitrators Association.~~ 393–396

* (b) This Charter Party shall be governed by and construed in accordance with Title 9 of the United States Code and the Maritime Law of the United States and should any dispute arise out of this Charter Party, the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for purpose of enforcing any award, this agreement may be made a rule of the Court. The proceedings shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc.. 397–406

For disputes where the total amount claimed by either party does not exceed the amount stated in Box 25** the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators, Inc.. 407–410

~~* (c) Any dispute arising out of this Charter Party shall be referred to arbitration at the place indicated in Box 25, subject to the procedures applicable there. The laws of the place indicated in Box 25 shall govern this Charter Party.~~ 411–413

~~(d) If Box 25 in Part I is not filled in, sub-clause (a) of this Clause shall apply.~~ 414

~~* (a), (b) and (c) are alternatives; indicate alternative agreed in Box 25.~~ 415

** Where no figure is supplied in Box 25 in Part I, this provision only shall be void but the other provisions of this Clause shall have full force and remain in effect. 416–417



This document is a computer generated GENCON 1994 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

# RIDER CLAUSES TO MCV/CRSL NCSA/ GULF TO BUENAVENTURA CHARTER PARTY DATED MAY 29, 2009

## CLAUSE 18 – PERFORMING VESSEL:

Nominated vessel to be Single deck bulk carrier, Classed highest Lloyds or Equivalent, and fully ISM certified, geared with minimum 25 MT lifting Capacity.

Vessel to have rain tents onboard for loading and/or discharging, unless vessel have McGregor or similar hatch covers, or Pontoon System.

## CLAUSE 19 – VESSEL'S SIZE:

Nominated tonnage to have carrying capacity to lift the minimum quantities nominated by the Charterers.

## CLAUSE 20 – LOADING PORTS:

Loading ports for DAP/MAP/KMAG: One or two safe berths each, always afloat, always accessible, out of Tampa and Beaumont, Texas.

Loading port for Urea: One safe berth, Puerto Jose or Point Lisas, always afloat, always accessible.

## CLAUSE 21 – DISCHARGE PORT(S):

Discharge port for DAP/MAP/KMAG: Buenaventura, Colombia, one safe always accessible, not always afloat, but safe aground berth (NAABSA).

Discharge port for Urea: Barranquilla, MCV private berth, always afloat, always accessible, where Charterers guarantee minimum 29 feet Fresh Water Draft available and/or Buenaventura, Colombia, one safe always accessible, not always afloat, but safe aground berth (NAABSA).

## CLAUSE 22 – PARCEL SIZE/MATERIAL/QUANTITY/PERIOD:

The quantity for the contract to be treated as a requirement contract, wherein MCV binds themselves to ship all cargoes they have from ports named in Clause 20 to ports named in Clause 21, and CRSL binds themselves to transport all cargoes nominated by MCV.

### Cargo sizes

Cargo sizes, in Monomeros' option

Urea: 8,000 MT 10% MOLOO or 10,000 MT 10% MOLOO or 12,000 mt 10% MOLOO.

DAP/MAP/KMAG: 15,000 10% MOLOO OR 12,000 MT 10% MOLOO or 10,000 MT 10% MOLOO or 8,000 MT 10% MOLOO.

## CONTRACT PERIOD:

The duration of the Charter Party, shall be from the Charter party date, and annually thereafter, one a year to year basis. However, either party hereto shall have the right to cancel this Charter Party as of December 31st of any year, including the initial period, by giving the other party written notice, on or before September 1st of that particular year.

## PART CARGO:

Subject to Charterers prior approval, owners have the option to load cargoes under this Charter Party as part cargoes.



**RIDER CLAUSES TO MCV/CRSL NCSA/ GULF TO BUENAVENTURA CHARTER PARTY DATED MAY 29, 2009**

### CLAUSE 23 –LOADING AND DISCHARGE SPEED/ FREIGHT RATES/CARGO SIZES:

**Loading** Tampa 7,500 MT per weather working day of 24 consecutive hours Sundays and Holidays included (SHINC), and Beaumont 7,000 MT per weather working day of 24 consecutive hours Sundays and Holidays excluded, unless used.

**Loading** Puerto Jose, 11,000 MT per weather working day of 24 consecutive hours, Sundays and Holidays included (SHINC).

**Loading** Point Lisas 4,000 MT per weather working day of 24 consecutive hours, Saturday PM, Sundays and Holidays excluded, unless used.

**Discharging** Barranquilla, 6,000 MT peer Weather working day of 24 consecutive hours, Sundays and Holidays included (SHINC)

**Discharging** Buenaventura, 3,000 MT per weather working day of 24 consecutive hours, Sundays and Holidays included (SHINC)

**For all quantities**, freight rate per MT FIOT, cargo sizes, each 10% More or less in Owners' option (MOLOO)

Loading Tampa and Beaumont to Buenaventura, 2-1

    A)  US$ 34.00 for 15,000 MT size
    B)  US$ 35.50 for 12,000 MT size
    C)  US$ 37.00 for 10,000 MT size Quantity per port 50/50
    D)  US$ 41.00 for  8,000 MT size Quantity per port 50/50

Loading Puerto Jose to Barranquilla

    A)  US$ 18.00 for 12,000 MT size
    B)  US$ 19.75 for 10,000 MT size
    C)  US$ 21.50 for  8,000 MT size

Loading Puerto Jose to Barranquilla and Buenaventura, 1-2

    A)  US$ 37.75 for 12,000 MT size
    B)  US$ 38.50 for 10,000 MT size
    C)  US$ 40.00 for  8,000 MT size

Loading Puerto Jose to Buenaventura

    A)  US$ 36.25 for 12,000 MT size
    B)  US$ 37.00 for 10,000 MT size
    C)  US$ 38.50 for  8,000 MT size

Loading Point Lisas to Barranquilla

    A)  US$ 21.00 for 12,000 MT size
    B)  US$ 22.75 for 10,000 MT size
    C)  US$ 23.50 for  8,000 MT size

**RIDER CLAUSES TO MCV/CRSL NCSA/ GULF TO BUENAVENTURA CHARTER PARTY DATED MAY 29, 2009**

Loading Point Lisas to Barranquilla and Buenaventura 1-2

    A)  US$ 38.50 for 12,000 MT size
    B)  US$ 39.50 for 10,000 MT size
    C)  US$ 43.75 for  8,000 MT size

Loading Point Lisas to Buenaventura

    A)  US$ 37.00 for 12,000 MT size
    B)  US$ 38.00 for 10,000 MT size
    C)  US$ 42.25 for  8,000 MT size

For cargoes to Barranquilla, MCV have the option, declarable on vessel acceptance, to decrease the discharge speed to 3,000 MT per weather working day of 24 consecutive hours Sundays and Holidays included (SHINC) against increasing the freight rate by US$ 2.00 per MT.

For each voyage under this Contract, the freight rates above will be adjusted to the percentile variation of the General Freight index, published weekly, on Saturdays, by the Maritime Research Inc., New Jersey, U.S.A. The index published closest to the Bill of Lading date to apply. The above rates are based basis the General Index of 386.6

For each US$ 1.00, the average quoted price by LQM for Panama, for IFO 180 CST, on the date closest to the Bill of Lading date, is over or under $ 330 per MT, the freight rates to be adjusted by US$ 0.01583.

For each US$ 1.00, the average quoted price by LQM for Panama, for MDO on the date closest to the Bill of Lading date, is over or under $ 530 per MT, the freight rates to be adjusted by US$ 0.00241.

**CLAUSE 24 – FREIGHT PAYMENT:**

100% Freight to be paid within 3 banking days from signing/releasing of Bill of lading, in freely transferable US$, via telegraphic transfer to a bank account designated by Compass Rose Shipping Ltd.

Demurrage to be paid, in freely transferable US$, via telegraphic transfer to a bank account designated by Compass Rose Shipping Ltd.

Compass Rose Shipping Ltd., have the option to have freight paid 95% in US$ and 5% in Colombian pesos,, payable basis official rate of exchange on the date of payment.

Full freight deemed earned as the cargo is loaded onboard, and is discount less and non returnable ship and or cargo lost or not lost.

Upon vessel's completion of loading, owners to send e-mail to Charterers containing:

    Date/hour loading finished

    Quantity loaded

    Date/hour notice of readiness tendered at loading

    Estimated demurrage or dispatch and invoice for freight

    Estimated arrival draft

GERENCIA JURIDICA
Sergio Arguello A.

**RIDER CLAUSES TO MCV/CRSL NCSA/ GULF TO BUENAVENTURA CHARTER PARTY DATED MAY 29, 2009**

## CLAUSE 25 – LAYTIME:

Further to Clause 6C.

Laytime at load port shall commence at 07:00 AM the next working day after Notice of Readiness has been presented during the afternoon the Previous day. If presented before noon, then the time to start at 1300 hours the same day. If loading commences before laytime begins, then time to count from commencement. In Puerto Jose the NOR can be presented any time, day or night, Sundays and Holidays included (SHINC).

Time lost in waiting for berth to count as loading and discharging time, provide Notice period had expired.

If Charterers are not able to berth the vessel immediately upon arrival, the owners have the option to anchor the vessel at the Barranquilla/Buenaventura outer anchorage, and tender notice of readiness from this place, and the time will count as if the vessel was in berth. Time used for shifting from anchorage to the berth not to count, even if the vessel is on demurrage. If the authorities should not grant free pratique upon vessels arrival at the berth, then time from such free pratique is rejected until the free pratique is granted, not to count as laytime.

Loading and discharging time is non-reversible

If draft survey at loading and/or discharging port is conducted, then time use to count as laytime.

The first 24 hours waiting time at the Panama canal, counting from vessel drops anchor, till anchor Is weighed, to be for the account of the Owners. Any time in excess of the 24 hours, to be for the account of the Charterers, and to be billed at the demurrage rate.

## CLAUSE 26 – DEMURRAGE RATE:

Demurrage rate to be advised by the owners on vessel nomination, but maximum $ 40,000 / half dispatch basis laytime saved both ends.

Charterers to be responsible for demurrage, at both the Loading and discharging ports.

Demurrage is payable in US$ latest 60 days after full documentation requested  by the Exchange Foreign Office is presented by the ships agent in Colombia, if applicable.

At discharge port, if shore cranes are used simultaneously with vessels gear all despatch generated will be recognized by MCV.

For payment of demurrage in US$, following documents are required:

a) Loading port Notice of Readiness, Statement of Facts and Time Sheet.
b) Load port Original laytime liquidation, Original documents as per A), B) and C) above to be sent soonest after vessels sailing.
c) Discharge port Notice of Readiness, Statement of Facts and Time Sheet.
d) Year of Construction of the vessel.
e) Discharge port Laytime liquidation.



**RIDER CLAUSES TO MCV/CRSL NCSA/ GULF TO BUENAVENTURA CHARTER PARTY DATED MAY 29, 2009**

### CLAUSE 27 – CARGO/VESSEL NOMINATION:

A.

The first day of each quarter, Charterers are to give the Disponent Owners their suggested number of shipment dates, such schedule to be reduced to a fixed number latest one month prior to commencement of shipment.

B.

Performing vessel or SUB, to be nominated latest 10 days prior to ETA. Performing vessel to be nominated latest 5 days prior to ETA. Performing vessel to be nominated latest 5 days prior to ETA.

D.

On nomination of performing vessel, Disponent Owners to inform the Charterers of following:

    A) Classification of vessel
    B) Flag of vessel
    C) Official registration number of vessel
    D) Confirm the validity of the cargo gear certification

### CLAUSE 28 – WEIGHT AND TONNAGE DUES:

Vessel to pay normal port expenses, but Weight and Tonnage dues, if any, at loading port to be for Shippers/Charterers' account.

### CLAUSE 29 – PROTECTIVE CLAUSES:

New Jason Clause, New Both to Blame collision clause, P and I Bunkering Clause, Chamber of Shipping War Risk Clause 1 and 2, to be deemed part of this Contract.

### CLAUSE 30 – NOTICE CLAUSE:

Vessel's notice of arrival to be given by the Owners or their representative as follows:

Owners to give 7 days Notice of ETA. Owners further to give 72/24/24 hours notice of ETA at port of loading, indicating date and hour. Copy of all notices of the vessel's arrival at loading port, to be given by E-mail to Charterers.

At discharging port, notice to be given 72/48/24 hours prior to vessels arrival, indicating date and hour of estimated time of arrival.

Notice at both loading and discharging ports to be given to whom Charterers designate in due time at each port.

Immediately of termination of discharge, the vessel to free and leave Monomeros' private berth, excepting duly certified case of Force majeure, otherwise Owners to pay berth dues at the same rate of demurrage per day or pro rata. In the event the vessel must do repair, or is delayed in freeing the berth, and no vessel is due in Monomeros' private berth, vessel to sit free of expenses to Owners until such time another vessel comes into berth. In case of repair, and if no risk of vessels safetiness, at Monomeros' option, these repairs to be performed at Monomeros' berth or at anchorage.

GERENCIA JURIDICA
Sergio Arguello A.

**RIDER CLAUSES TO MCV/CRSL NCSA/ GULF TO BUENAVENTURA CHARTER PARTY DATED MAY 29, 2009**

## CLAUSE 31 – SHIFTING EXPENSES:

Shifting from waiting place/anchorage, to berth, not to count as laytime. Ship to be left in seaworthy trim to Masters' satisfaction, when shifting between loading and discharging berth, but master to remain responsible for proper stowage. If charterers require second or more berth(s) same port, shifting time and expenses to be for Charterers account, and vessel to be left in seaworthy trim.\

## CLAUSE 32 – SEPARATION:

In case of loading 2 or more grades, natural separations of vessel will be used. If vessel however is unable to separate by natural separation, then all separations to be for Charterers' account, and time used for arranging separations to count as laytime.

## CLAUSE 33 – STEVEDORE DAMAGE:

Charterers to be responsible for stevedore damage at loading and discharging ports. Master to notify Charterers or their representatives, in writing, immediately upon occurrence of the damage, and same to be repaired by Charterers, at their cost and expense, prior to the vessel leaving the berth or anchorage. However damages to be repaired either at berth or anchorage, at MCV's option but in no case with any risk to the vessels safety.

## CLAUSE 34 – OPENING AND CLOSING OF HATCHES:

Ship's crew to undertake opening and closing of hatches, when required, unless prohibited by local regulations.

## CLAUSE 35 – OVERTIME:

Overtime, if any, at both ends, to be for account of party ordering same. Officers and crew overtime and wages, to be for Owners' account. Overtime ordered by Port Authorities to be for Charterers' account.

## CLAUSE 36 – HARDSHIP CLAUSE:

Both Charterers and owners to realize, that circumstances may arise, which could not be foreseen at the time of this agreement. They therefore agree that neither party shall gain undue and unreasonable advantage over the other, as a result of such unforeseen circumstances. Should such circumstance arise during the period of this contract, placing undue hardship on either party, both sides shall be entitled to adjustment of the conditions of this contract, to make it operate in all fairness to both parties, provided any change in the freight market shall not be considered to be an unforeseen circumstance hereunder.

## CLAUSE 37 – CORRESPONDANCE/E-MAIL EXCHANGES

All correspondence and email exchange to constitute the terms and conditions of this contract.

## CLAUSE 38 – SINGLE VOYAGE:

When owners have definitely nominated a vessel, to perform under this contract, same to be considered a single voyage.

# RIDER CLAUSES TO MCV/CRSL NCSA/ GULF TO BUENAVENTURA CHARTER PARTY DATED MAY 29, 2009

## CLAUSE 39 – MANOR WAR CLAUSE:

In the event of outbreak of a major war, involving any or more of the following powers, Great Britain, Germany, U.S.A., Russia, France, Norway, China and Colombia,, both owners and Charterers shall have the right to cancel this contract.

## CLAUSE 40 – MINE AND WAR CLAUSE:

Any increase in Mine and War Risk Insurance premiums and/or war bonuses to the Master, officers and crew, over those in effect on the date of this contract, shall be for Charterer's account. Such premium and/or bonuses shall cover trading only between the loading and discharging ports stated in this contract, for the period a vessel is so employed if single voyage. If consecutive voyages and returning in ballast to Charterers loading port, such premium and or bonuses shall also cover such a ballast leg.

## CLAUSE 41 – SUPER HOLIDAYS:

Although loading and discharging terms are SHINC, the following Super Holidays to be excepted: January 1, Holy Thursday, Good Friday and December 25th.

## CLAUSE 42 – BIMCO standard ISM clause for voyage and Time Charter Parties:

From the date of coming into force of the International Safety Management (ISM) code in relation to the vessel and thereafter during the currency of the Charter Party, the owners shall procure that both the vessel and the Company (as defined by the ISM code) shall comply with the requirements of the ISM code. Upon request, the owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in the Charter Party, loss, damage, expenses or delay caused by the failure on the part of the Owners of "the company" to comply with the ISM Code, shall be for the Owners' account.

## CLAUSE 43 - P & I BUNKER DEVIATION CLAUSE 1948:

The vessel in addition to all other liabilities shall have liberty as part of the contract voyage and at any stage thereof to proceed to any port or orts whatsoever whether such ports are on or off the direct and/or customary route or routes to he ports of loading or discharge, named in the Charter, and there take oil bunkers in any quantity in the discretion of owners, even to the full capacity of the fuel tanks, deep tanks, and any other compartment in which oil can be carried whether such amount is or is not required for the chartered voyage.

## CLAUSE 44 - BIMCO ISPS/MTSA CLAUSE FOR VOYAGE CHARTER PARTIES 2005

(a)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).
(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

**RIDER CLAUSES TO MCV/CRSL NCSA/ GULF TO BUENAVENTURA CHARTER PARTY DATED MAY 29, 2009**

**(iii)** Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

**(b)(i)** The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS code/MTSA.

**(ii)** Loss, damages or expense (excluding consequential loss, damages or expense) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party, and any delay caused by such failure shall count as laytime or time on demurrage.

**(c)** Provided that the delay is not caused by the Owners' failure to comply with their obligations under the ISPS Code/MTSA, the following shall apply:

**(i)** Notwithstanding anything to the contrary provided in this Charter Party, the Vessel shall be entitled to tender Notice of Readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS Code/MTSA.

**(ii)** Any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS Code/MTSA shall count as laytime or time on demurrage, unless such measures result solely from the negligence of the Owners, Master or crew or the previous trading of the Vessel, the nationality of the crew or the identity of the Owners' managers.

**(d)** Notwithstanding anything to the contrary provided in this Charter Party, any costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew or the previous trading of the Vessel, the nationality of the crew or the identity of the Owners' managers. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

**(e)** If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.



GERENCIA JURIDICA
Sergio Arguello A.